## Matlack, Appellant, v. Pennsylvania Power and Light Co.

Argued May 22, 1933. Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*T. D. Caldwell,* of *Caldwell, Fox & Stoner,* for appel-
lant.

*Geo. Ross Hull,* of *Snyder, Miller, Hull & Hull,* with
him *George H. Hafer,* for appellee.

OPINION BY MR. JUSTICE MAXEY, June 30, 1933:

At about 11 a. m., November 3, 1930, James R. Matlack, husband of the plaintiff, while pursuing the regular course of his employment as a painter for the State Highway Department, was painting the top girder at the third cross-arm from the east end of the bridge crossing the Juniata River near the Borough of Newport, Perry County. At that time the appellee owned and maintained high tension electric wires on that bridge, carrying them on cross-arms fastened to the girders on the south side of the bridge. Matlack while painting came in contact with these wires and received from them an electric shock and burns, causing him to fall into the Juniata River, sixty feet below. When falling, he struck his head on a girder and fractured his skull. He died about six p. m. the following day "from electric burns, shock and a fractured skull." His widow brought action for damages in the sum of $10,000 charging the defendant with negligence in permitting the insulation on the wires to wear off and failing to give the decedent and others who were working on the bridge warning of the condition of the insulation.

At the close of plaintiff's case defendant moved for a compulsory nonsuit. The motion was granted. The court below refused to take off the compulsory nonsuit and entered judgment for the defendant. Plaintiff appealed.

The questions presented are: (1) Did plaintiff make out a prima facie case of negligence? (2) Did plaintiff make out a case free from contributory negligence?

The evidence presented in behalf of plaintiff was that the deceased was working on the top beam or girder, commonly called the "chord." This chord was about fourteen inches wide and about thirty feet above the bridge floor, and the only means of support for a man painting as decedent was on top of this "chord," or beam, was to sit on it. The three wires of the defendant company which ran parallel with the bridge were suspended

on cross-arms running practically at right angles with the chord. Each wire carried 2,300 volts. The nearest of these wires was approximately fourteen inches from the chord on which Matlack was working and in a diagonal direction above it. These wires were apparently insulated and were attached to insulators on the cross-arms by means of a tie wire. This latter wire was uninsulated. The tie wire was wrapped around the insulated wire at two points and at the point of the accident had cut through the insulation to the main wire. No one saw Matlack touch the wire, but when a witness glanced up, Matlack was lying on the chord with his hand near or on the insulator. The deceased, when seen by a witness immediately prior to the accident, was about 18 inches away from the cross-arm. When the deceased was next seen, he had hold of one of the high tension wires. The foreman called to him "to let go" of that wire. The deceased was then described by the witness as giving "a few kicks" and falling into the river. In falling through the bridge the deceased struck a girder, and when he was later examined, evidences were found of burns on his right hand. He was pulled out of the river unconscious.

The bridge had been painted two weeks before the accident and Matlack was engaged in the work of giving it a "second coat." He had worked about a week on this bridge some time before the accident and quit for three or four days and then had worked three days again when the accident happened. The foreman testified that he had warned Matlack that these wires "were loaded," and told him "whatever he did to keep away from those wires because there was twenty-two hundred volts in them." He was told this "half a dozen times."

The court below was correct in determining that there was not sufficient evidence of the defendant's negligence to warrant the submission of this case to the jury. In determining whether or not there has been negligence it has been held that the consequence should be one

which in the light of attending circumstances an ordinarily prudent man ought reasonably to have foreseen might possibly occur as the result of his negligence.

"The injury must be the natural and probable consequence of the negligence, such a consequence as under the surrounding circumstances of the case might and ought to have been foreseen by the wrongdoer as likely to flow from his act": Hoag & Alger v. Lake Shore & Michigan Southern R. R. Co., 85 Pa. 293.

Rugart et al. v. Keebler-Weyl Baking Co., 277 Pa. 408, 413, 121 A. 198: "In Pennsylvania, liability for negligence depends on the antecedent probability, not the mere possibility, of harmful results therefrom. The general test of liability is whether the injury imputed to the defendant is such that a person of ordinary intelligence would have foreseen it as the natural and probable outcome of his conduct."

Measured by these tests, it must be held as a matter of law that there was no evidence of negligence on the part of the defendant company. Both the insulated electric wires and the uninsulated wires were so placed that there was no reason for the defendant to anticipate that anyone working as the decedent was would come in contact with them. The tie wires were not so situated that it could be reasonably anticipated that they would if electrified become a menace to human life and limb; therefore, no duty of *continuing inspection* of them rested upon the defendant. There is no law requiring such an inspection of insulated wires as will make their owner virtually an insurer of the safety of anyone who *by any possibility* may come in contact with them. All that was required under the circumstances here was *reasonable inspection from time to time,* and there is no evidence that defendant failed to meet this requirement or that this unfortunate accident resulted from any such failure. The insulation may have been defective for only a short time, or it may have been defective for a time so long that the defendant company should have known of

it, but in the absence of proof as to either it would not have been just to permit the jury to make an award based on mere conjecture.

Appellant cites the case of Morgan v. Westmoreland Electric Co., 213 Pa. 151, 62 A. 638. That was a case in which there was alleged: (1) faulty original construction of the lines of electric light wires; and (2) constructive notice of defective insulation. As to this the court said in an opinion by Mr. Justice FELL: "...... there was evidence tending to show that the manner in which the electric wires were carried through a network of telephone wires was faulty, and that the wire alleged to have caused the injury had been in use a number of years and had sagged and that its insulation had worn off." The facts disclosed that there was a certain pole with eleven cross-arms, supporting 130 telephone wires. The cross-arms were twenty-two inches apart, and each arm was supported by iron braces which extended down the pole to within a few inches of the next lower arm. The electric light company's wires were attached to the faces of the seventh and eighth cross-arms, and extended across the lines of the telephone wires. They were held in place at the cross-arms by the use of porcelain knobs, and their insulation was by *cotton covering ordinarily used for inside wiring.* These wires had been in use seven years, and the covering of the wire on the seventh cross-arm was worn off at its point of contact with an iron bolt which passed through a brace. It was customary for persons climbing among the wires for the purpose of inspecting them or repairing them to use the braces as an aid in climbing and as supports. The wrong complained of in that case was due to the obvious defects in the construction of the electric wires. No faulty construction is alleged in the case now before us. Neither were there any facts proved which would support the inference that the defendant company had constructive notice that the insulation at the point where the tie wire came in contact with the electric light wire had be-

come defective. A company transmitting electricity cannot be held to be an absolute guarantor of constant perfect insulation of its wires particularly at places where it has no reason to anticipate that persons will ordinarily be.

In the case of Ridgeway v. Sayre Electric Co., 258 Pa. 400, 102 A. 123, the insulation had been in a defective condition for nearly a year. Appellant also cites the case of Dugan v. Erie Co. Electric Co., 241 Pa. 259, 88 A. 437. In that case a man was electrocuted by his hand coming in contact with a heavily charged electric light wire of defendant company, while he was walking on the pavement of a city street. The wire had been burned through and one part of it hung from the pole and extended downward to within three inches from the ground, where the wind caused it to sway back and forth across the pavement. The telephone company had extended an uninsulated guy wire from one of its poles between the defendant's wires and had wound it around the pole of the latter, fifteen feet from the ground; for nearly a year the guy wire had been slack, so that the wind would blow it against the electric light wires and in wet weather a circuit would be completed and the weaker wire would be burned through. In that case it was held that the question whether there had been reasonable inspection of wires was for the jury. This recital of the facts in that case is sufficient to indicate that it differed widely from the facts of the case at bar in at least these two essential respects: (1) the victim was on a public street; (2) the guy wire had been in a defective condition for more than a year. In the case before us it was testified that the insulation of the main wire was in good condition except where the tie wire wrapped around it. There was no testimony that defendant company had actual notice of the defective insulation at that point, or that the insulation had been defective for a sufficient period to charge it with constructive knowledge.

This case also differs from the case of MacDougall v. Pa. Power & Light Co., 311 Pa. 387 [166 A. 589]. In that case the charged fuse box, according to the testimony offered in behalf of the plaintiff, had been placed where any person who might happen to be on the flat roof near which it was could easily come in contact with it, and it was shown at the trial that the roof was used for hanging clothes and was easily accessible from a kitchen door which opened on it. There was also evidence offered on behalf of plaintiff that the defendant company knew that the fuse box might be dangerous to human touch, for the company had issued orders that men working on such boxes should wear rubber gloves while doing so because in wet weather the outsides of such boxes become conductors of electricity. In the case before us the tie wire was in a position that would ordinarily be considered almost inaccessible except to persons who had special reasons for being in its vicinity, and it could rightfully be assumed that such persons would take extra precautions while in such a dangerous situation. Furthermore, there was no evidence that the defendant company knew that its tie wires became charged with electricity or that this particular tie wire had become so charged. In view of the undisputed evidence that decedent had been warned of the danger of these wires and knew of the deadly results likely to follow from contact with them, it became his duty to be careful not only not to touch the wires, but not to touch anything that was physically connected with them and which might become a conductor of electric current.

The judgment is affirmed.