Lindsay, Appellant, *v.* Glen Alden Coal Company.

Argued January 28, 1935. Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Philip V. Mattes,* with him *Milton J. Kolansky, Chernin & Gold* and *Morgan S. Kaufman,* for appellant.

*Reese H. Harris;* with him *C. P. O'Malley,* of *O'Malley, Hill, Harris & Harris, Franklin B. Gelder* and *J. Hayden Oliver,* for appellee.

OPINION BY MR. JUSTICE LINN, March 25, 1935:

This appeal is from the refusal to take off a nonsuit in an action brought to recover for the death of appellant's husband.

Lindsay, Pultz and Treverton, all experienced linemen, were employed by the Delaware and Hudson Railroad Company in repairing telegraph and signal wires on the line of its subsidiary, the Wilkes-Barre Connecting Railroad Company. On May 18th, after their work for the day was completed, they went on business of their own to Kingston, several miles from their living quarters on the railway. They returned between seven and eight o'clock, and, perhaps at 7:30, reached a point on the Kingston streets where the tracks of the railway company are maintained on an embankment of culm and cinders about 30 feet high, under which one of the streets passes. Along one side, at or near the top, the railway company maintained its wires; on the other side, and part way down the slope, the defendant coal company maintained a high tension line. Witnesses estimated the poles to be 90 feet apart. A guy wire extended from near the top of one pole to near the bottom of the next one. Each pole carried three wires, one wire being on the top of the pole and the other two at the opposite ends of a cross bar. To protect the embankment from flooding by high water in

the river, concrete slabs were fixed to the sides of the slope for a distance of 12 feet from the bottom, and at an angle "about 50%."

The weather was clear; the wires were visible to one who looked. Instead of continuing on the streets, the three men decided to ascend the bank and walk along the railway tracks to their quarters. The concrete slabs were smooth and slippery and the ascent so steep that it was necessary, they said, to make a running start beginning about 20 feet from the bottom in order to get over the concrete. Above the concrete, they also said, were paths in the culm bank, leading to the top. One of these passed under the guy wire described as "three or four feet" above the path. This wire was plainly visible; Pultz and Treverton both say they saw it. Their purpose was to "duck" under the wire at that point, though more convenient courses were at hand. Pultz ran up first; Lindsay followed, with Treverton so close behind him that Treverton (to quote his evidence) came "in contact with him and . . . [gave] . . . him a little push or jostle . . . just before he [Lindsay] reached the guy wire." When Treverton "got nearly to the top of the concrete," he reached "for Mr. Lindsay to help" him, so he "wouldn't go back down the bank again." But in this struggle to ascend, he, Treverton, "fell down again," and then heard a report, saw a flash, and realized that something had happened to Lindsay. He summarized his account as follows: "Q. And isn't it a fact, Mr. Treverton, that he [Lindsay] turned around to see where you were, and he knocked you down the bank, that it was a slippery place, that you made a grab at the guy wire and missed it, and he sort of grabbed you, reached for you, and that he lost his balance, catching hold of the guy wire, and in that case 'one of the hot ones came down'? Isn't that what happened there? A. As far as I know, that's what happened. Q. Now, the wire that came down, you don't know where it hit, do you? A. No, sir. Q. No? You

saw the wire that came down? A. Yes, sir. Q. Didn't two wires come down? A. Yes, sir."

Pultz had reached the top of the bank and did not see what happened to the two men below, who never reached the path along the railway on the top of the bank. After hearing the report, he noticed a wire hanging down from each of the two poles between which they tried to ascend the bank. Next day witnesses saw that two of the three wires were down, one of them near the guy wire, but there "was not a single mark on the guy wire" to indicate a burn or contact.

There was evidence that, several hours before, flashes were seen and that one of the high tension wires strung on the poles along the bank "was lying broken; it was on the ground." It does not appear exactly where this wire was with regard to the guy wire at or near which Lindsay and Treverton struggled with each other.

Plaintiff cannot recover unless death resulted from breach of some duty owing to decedent. The burden of proof was on her. She contends that defendant was negligent in permitting a charged wire or wires to fall, or in not having strain insulators on the guy wire. If the charged wire was down, as some evidence indicates, plaintiff, an experienced lineman, must have seen it, if he looked where he was going; if he did not look and, by that oversight, walked against it, his contributory negligence bars recovery: Payne v. West Chester Boro., 273 Pa. 570, 117 A. 335; Roth v. Verona Boro., 316 Pa. 279; Boyd v. Kensington Water Co., 316 Pa. 522.

If the wire was not down when decedent ran up the concrete, and, in his tussle with Treverton, he grasped or otherwise came in contact with the guy wire and pulled down the charged wire, his own conduct was again the proximate cause of the injury: Elliott v. Light Co., 204 Pa. 568, 54 A. 278; Kosson v. Power Co., 293 Pa. 131, 141 A. 734. There is no evidence that the line was defectively constructed. Defendant was not bound to anticipate that persons in the position of Lindsay and

Treverton would pull it down. Compare Matlack v. P. P. & L. Co., 312 Pa. 206, 167 A. 37; O'Gara v. Phila. Elec. Co., 244 Pa. 156, 90 A. 529; Wright v. R. R. Co., 314 Pa. 222, 171 A. 593.

There is nothing to indicate that a strain insulator (assuming, without deciding, that evidence on the point was admissible) would have prevented the injury, because there is no evidence that the guy wire was charged. The jury could not be permitted to guess about these matters: Mulligan v. Traction Co., 241 Pa. 139, 88 A. 318; Gausman v. Pearson Co., 284 Pa. 348, 131 A. 247.

The wires were inaccessible from the street and from the bottom of the slope, and at those points there was no danger. The 12 feet of slippery concrete slabs, set along the bottom of the slope at an angle of 45 to 50 degrees, which could only be ascended by taking a running start from a point twenty feet from the base, were a warning against traveling up the side of the slope. The evidence that people ran up the concrete and then walked at one place or another over the culm bank to the top is not of such character as to establish a right of way or to put an increased burden on defendant in the circumstances disclosed by the evidence. See Leithold v. Ry. Co., 47 Pa. Superior Ct. 137; Conn v. R. R. Co., 288 Pa. 494, 136 A. 779; Falchetti v. P. R. R., 307 Pa. 203, 160 A. 859. Decedent's heedlessness resulted in his death: Brown v. Scranton, 313 Pa. 230, 169 A. 435.

Judgment affirmed.