[Civ. No. 1833. Fourth Appellate District.—June 14, 1937.]

DOMINGO BARTULUCI, Respondent, v. SAN JOAQUIN LIGHT AND POWER CORPORATION (a Corporation), Appellant.

Thomas J. Straub, W. H. Spaulding, John J. Briare and F. H. Pearson for Appellant.

Rae B. Carter and Edmond A. Chevalier for Respondent.

BARNARD, P. J.—This is an action for damages on account of electrical burns suffered by the plaintiff on June 3, 1935, when a hay derrick was brought into contact with an overhead power line. A jury returned a verdict in favor of the plaintiff and the defendant has appealed from the judgment.

The accident happened in a hay field belonging to one Rusconi. A power line consisting of three wires crossed this field to a pumping plant, having been built under an agree-

ment which provided that the appellant should construct and maintain the power line but that the materials used in the construction of the same should belong to Rusconi. These power wires were 29 feet 9⅝ inches from the surface of the ground at the poles, and 27 feet 7 inches from the ground at the point of greatest sag, midway between the poles, where the accident occurred.

The derrick in question was mounted on wheels and designed to be pulled from place to place as needed. The upper part of the derrick consisted of a boom so mounted on a mast that it would swing from side to side. When in a position for use this boom was set at an angle so that one end of it was a number of feet higher than the other end. It was so constructed that by taking out one bolt the high end of the boom could be lowered several feet. When elevated the highest point of the boom was 28 feet 4⅞ inches from the ground or 9⅞ inches higher than these wires at their lowest sag. At the high end of the boom a 5-inch pulley or block, mounted on a swivel, was attached to an eyebolt which passed through the boom and was fastened on the upper side by a nut which projected an inch or an inch and a half above the top side of the upper end of the boom. A steel cable, which was attached to a hay fork, used at the rear of the derrick, passed up and through this pulley, downward through another pulley at the low end of the boom and then out to a singletree in front of the derrick, to which a horse was attached for the purpose of raising the hay. When the derrick was moved about a field the horse was hitched to the tongue of the derrick, the fork was placed on the rear end, the cable was drawn taut and tied to keep the boom from swaying from side to side, and the front or horse end of the cable was allowed to drag on the ground, extending under the derrick and behind it for some eight or ten feet.

For some days prior to June 3d the respondent had worked with this derrick in another field. The crew, all employees of Rusconi, consisted of Walter Patch who acted as foreman, Joe and Tony Padilla, father and son, and the respondent. Just before the derrick was moved to the field where this accident occurred, Rusconi, in the presence of the respondent, ordered the men to lower the boom before moving it. The respondent took no part in moving the derrick to this field, but continued his work with it after its arrival there. On

the day in question the derrick was moved twice, without trouble. It was then about 200 feet from the power line, and a third move was started about 10:30 A. M. The boom was not lowered, and as the derrick moved forward Tony Padilla was driving the horse and his father and the respondent were walking some ten or twelve feet to the rear. As the derrick reached the power line, at its point of greatest sag, some part of the high end of the boom came into contact with one of the wires, and the respondent was injured as he grasped the steel cable and attempted to pull the boom away from the wires.

It is respondent's contention that the appellant was guilty of negligence in maintaining these power wires at an insufficient height from the ground in view of the facts, as alleged in the complaint, that it was customary in this agricultural region to move about hay derricks "equipped with rigid undetachable booms" which "projected and now project further above the surface of the ground than the height of the wires", that the appellant was aware of this custom and that this particular derrick was of the customary type "with a boom attached to the top of its vertical mast in a rigid and undetachable position". The appellant calls our attention to a rule of the Railroad Commission, as then in force, requiring lines of this character to be maintained at least twenty-five feet above the ground in agricultural regions, and to a rule of the Industrial Accident Commission prohibiting the operation or transportation of any machinery or equipment, or any part thereof capable of a swinging motion, under or near high voltage lines unless there is a clearance of six feet, except under certain conditions. The appellant contends: (1) that the evidence is insufficient to show negligence on its part since the only evidence of a custom in moving hay derricks in that neighborhood relates to derricks similar to this which were so constructed that their booms could be readily lowered, that there is no evidence of any custom of moving derricks higher than these wires which were equipped with rigid undetachable booms, and that, regardless of any custom, this particular derrick was so constructed as to enable it to be readily lowered; (2) that if any negligence appears on the part of the appellant it was merely a remote condition, and the proximate cause of the accident was the act of the respondent's coemployees in moving the derrick into the wire without lower-

ing its boom; (3) that the plaintiff was guilty of contributory negligence as a matter of law; and (4) that the trial court committed prejudicial error in giving a particular instruction.

█ In our opinion, the evidence discloses negligence on the part of the respondent, which, as a matter of law, prevents his recovery in this action and, under our view of that part of the problem, it becomes unnecessary to consider the other points raised.

Walter Patch was not called as a witness and the only evidence as to what occurred at and around the time of the accident is the testimony of the respondent and of Tony and Joe Padilla. The respondent argues that the question of contributory negligence must be determined solely upon his own testimony, since the other two eyewitnesses were not looking at the precise moment when he grasped the steel cable. While this is largely true the evidence of the other two, called by the respondent, throws some light upon the problem and will be briefly reviewed.

Tony Padilla testified that he was driving the horse in moving the derrick; that as they started to move Patch was about 100 feet away; that they did not lower the boom; that as they moved forward the lower end of the boom was toward the horse and the higher end was toward the rear of the derrick and a little to one side; that the lower end of the boom passed under the wires first; that the first of the three wires slipped over the high end of the boom; that the little bolt on top of the boom caught on the second wire; that he stopped when his father called to him; that his father told the respondent to be careful as the wire was caught on top of the boom; that he looked around and saw the respondent running at the cable; that the respondent took hold of the cable just above the fork; that this occurred about a half minute after his father told him to stop; that he went back and saw fire on the end of the cable that was dragging; that the fire burned in that part of the cable that was on the ground all of the time from the time he heard the second wire strike the boom until they pulled the derrick out of the wire after the respondent was taken from the scene; that the wire remained caught on top of the boom for five or ten minutes and until after the respondent was taken away; that no part of the cable between the fork and the upper pulley

touched the ground; that the other end was dragging; that the boom could be easily lowered; that this would take about ten minutes; and that he did not know the derrick was up against the wire until his father called to him to stop.

Joe Padilla testified that he and the respondent were walking behind the derrick; that his attention was attracted by a lot of sparks coming from the end of the cable which was dragging on the ground; that when he saw the sparks flying from the end of the cable the boom of the derrick was a little on one side and "was right there almost close to the line"; that when he called to Tony to stop the boom was touching the power line; that "the high point of it" was touching the power line; that when he told Tony to stop he tried to call Patch because he was the one that gave them orders; that before the respondent touched the cable he told him to be careful because he thought the boom was touching the lines; that after he called to Patch he looked again and saw that the respondent had hold of the cable; and that when Patch got over there the respondent had fallen down and the cable had broken away from him.

The respondent testified that he was about ten feet behind the derrick when it stopped; that he saw fire in the part of the steel cable which was dragging; that he was about eight or ten feet from this fire when he first saw it; that he was shoving some hay away so it would not catch fire; that the fire around the cable lasted three or four minutes and maybe five; that Joe told him "Don't touch that cable. You will get burned"; that he replied that he would not touch it; that he watched the rope for seven or eight minutes; that it did not burn all that time; that when he saw the cable was not burning any longer he looked up at the pulley to see if it was touching the power line; that the pulley was not touching the power line but was away from it a distance of two or three inches; that when he saw the power line was not in contact with the pulley or boom he took hold of the part of the cable which led to the high end of the boom; that he did this in order to pull the boom back about ten inches from the power line; and that when he took hold of the cable "the high side of the boom" was resting against the power wire. When asked again if any part of the high end of the boom was resting against the wire when he took hold of the cable he replied, "the high side". He further testi-

fied that when he took hold of the cable there was no fire on that part of the cable which was on the ground; that when he saw no fire there he looked up at the wire to see if it was touching the pulley and it was not; that when he took hold of the cable "it drew me all up"; that before he took hold of the cable he did not know how much electricity the wire carried; and that he did not know how long he had hold of the cable.

On cross-examination, he testified that for most of his life and up to seven years before he had worked in mines; that he had worked at drilling rock in tunnels on the Southern California Edison project near Huntington Lake, and on the Hetch Hetchy project; that he had worked where electricity was brought to mucking machines by insulated wires; that he had worked in mines which had mills operated by electricity; that when this hay derrick was moved the cable from the fork to the high point of the boom and from the lower end of the boom down to the floor of the derrick was pulled tight and fastened; that this kept the boom from swinging around as they moved; that when they moved the third time the boom was pointing forward and to the left at an angle of about 45 degrees; that he was five or six feet behind the derrick and about four or five feet to the left of the dragging end of the cable when the boom struck the wire; that he then looked up at the higher point of the boom; that he knew the boom had struck the power line because the "iron rope" was burning; that when he saw the fire he looked up to the point where the pulley was at the upper end of the boom; that he saw the power wire in contact with the boom; that the green grass was burning; that he knew it was electricity coming down the cable that made the fire on the ground; that when he looked up he saw that it was touching the wire and that he knew it was because of this contact that the electricity was coming through the cable and starting the fire on the ground; that the wire was in contact with the derrick at the time Joe told him not to touch the cable; that he looked up at the wire because he thought it was touching because the grass was burning; that he knew nothing about electricity; that he took hold of the cable when he did not see any more fire; that this was after Joe had warned him not to touch it; that when he took hold of the cable "it held me"; that he took hold of the cable because he wanted to pull the boom

about fifteen inches away from the wire "so that the horse could pull the derrick back"; that no one told him to take hold of the cable or pull the boom back; that when he looked up the first time the first wire was in contact with the boom; that when he looked up the second time the boom was touching the wire; and that he knew if it was not touching the wire he would not be burned.

The respondent alleged in his complaint "that certain eyebolt at the upper and outer end of the said boom of that certain hay derrick came in contact with defendant's said electric power line, and by reason thereof, electric current, then and there carried by said line, was transmitted into and through said eyebolt, and into and through that certain steel pulley attached to that certain eyebolt, and into and through and along that certain steel cable threaded through said steel pulley to that certain hay fork attached to the end of said cable". Tony Padilla, testifying for respondent, stated that the high end of the boom was toward the rear and a little to one side as the derrick moved forward and that the end of the eyebolt on top of the boom caught on the wire. His counsel now argue that when the respondent saw the cable "burning", as he put it, there was contact between the cable and the wire; that when the burning stopped the respondent looked up toward "the only objects that could have created that contact—the sheave (pulley) and the line"; that they were not then in contact, being separated by two or three inches; that the cable was then to all appearances as safe as though it were at the other end of the field; that the respondent then grasped the cable while it was in that safe position; that the moment he grasped it contact was reestablished; and that the jury was justified in drawing the inference that when he pulled the cable the five-inch pulley, having a turning radius of two and a half inches, turned and again came into contact with the line. It is then argued "When this respondent grasped that cable something unforeseen—something unanticipated, something this respondent had not taken into consideration, something that any ordinarily prudent and cautious person would never have thought of, occurred— the sheave turned on its swivel" and contact with the high voltage line was reestablished.

There is no direct evidence that the pulley itself was ever in contact with the power line. The respondent himself testi-

fied that when he first looked up he looked toward the higher point of the boom and at the point where the pulley was, and that he saw the wire in contact with the "boom". While he testified that when he looked up the second time the wire was not touching the pulley, he also testified several times that when he took hold of the cable "the high side" of the "high end" of the boom was resting against the wire. Assuming that the jury could believe the respondent's testimony that the derrick was being moved on this occasion with the high end of the boom pointing forward and to the.left, a peculiar situation presents itself. The pulley hung downward from an eyebolt near the higher end of the boom. The wire, before anything touched it, was about an inch higher than the center of the pulley. If the high end of the boom was facing forward, as the derrick went under the wire, the pulley would strike the wire. If the wire slipped up over the top of the pulley it would rest against the lower part of the eyebolt or the under side of the high end of the boom. We have carefully studied the detailed diagram of this boom, the pictures and the evidence, and we are unable to understand how it would be possible for the high side of the high end of the boom to rest against the wire, as the respondent testified, and at the same time for the wire to be down below the boom where it could come in contact with the pulley.

However, we think it makes no difference in this case whether the high end of the boom was pointed forward or backward at the time in question, or whether the wire came in contact originally with the upper end of the eyebolt or with the pulley. If we adopt respondent's present theory, as distinguished from that alleged in his complaint, we are unable to agree with his contention that he was free from negligence since there was no contact at the instant he grasped the cable and that the resulting turning of the pulley on its swivel was something that an ordinarily prudent and cautious person would never have expected to occur. As respondent argues in another connection, "With respondent's pull on the cable the sheave necessarily turned on its swivel with a radius of 2½ inches". The pulley was equipped with a swivel for that purpose. The respondent was experienced in this work and his particular duty was to put the fork attached to the cable into piles of hay. This would necessitate a frequent pulling upon the cable, with a swinging of the boom, and he must

have been familiar with the way the pulley "necessarily" acted. Under this theory there is no evidence or suggestion as to how the original contact with the wire was broken. Assuming that it was, an unusually dangerous situation existed with a pulley, one that could thus easily turn, within about two inches of the wire. No reasonably prudent person believing that the contact, the evidence of which had been so clearly visible, came from this source, would or could consider that the pulley and cable were in a safe position. In our opinion, the theory now advanced as to how the contact occurred is not controlling upon the issue as to whether the question of contributory negligence here is one of law or one of fact.

The rules for determining whether the question of contributory negligence is one of law or one of fact are well established although sometimes difficult of application to particular circumstances because of the absence, in many cases, of a standard of conduct from which it can be determined exactly what the mythical reasonable man would have done under those circumstances. In the early case of *Fernandes* v. *Sacramento City Ry. Co.*, 52 Cal. 45, the rule is thus stated:

"But when there is no controversy as to the facts, and from these it clearly appears what course a person of ordinary prudence would pursue under the circumstances, the question of negligence is purely one of law. In such a case there is no function for the jury to perform in respect to the question of negligence."

In *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 Pac. 651], it is said:

"The rule is, that negligence is a question of fact for the jury, even when there is no conflict in the evidence, if different conclusions upon the subject can be rationally drawn from the evidence. . . . If but one conclusion can reasonably be reached from the evidence, it is a question of law for the court; but if one sensible and impartial man might decide that the plaintiff had exercised ordinary care, and another equally sensible and impartial man that he had not exercised such care, it must be left to the jury."

In *Williams* v. *Pacific Elec. Ry. Co.*, 177 Cal. 235 [170 Pac. 423], the court said:

"The question of contributory negligence is one of fact for the jury to solve under proper instructions, and not one of law, save in those cases in which, judged in the light of

common knowledge and experience, there is a standard of prudence to which all persons similarly situated must conform. In such cases failure to reach that standard is contributory negligence as matter of law.''

In view of the general and widespread use of electricity which has greatly increased with the passing years, knowledge of the fact that power lines supplying current to power plants of varying kinds are dangerous instrumentalities is well nigh universal, and the standard of care which is to be expected of a reasonably prudent man who has no technical knowledge of electricity must at least include his refraining from voluntarily and unnecessarily exposing himself to danger of contact with such wires. In *Stackpole* v. *Pacific Gas & Elec. Co.*, 181 Cal. 700 [186 Pac. 354, 356], it is said: ''It is a matter of common knowledge that any line carrying electricity for power is dangerous to a more or less degree.'' In *Matlack* v. *Pennsylvania Power & Light Co.*, 312 Pa. 206 [167 Atl. 37], the court said:

''In view of the undisputed evidence that decedent had been warned of the danger of these wires and knew of the deadly results likely to follow from contact with them, it became his duty to be careful not only not to touch the wires, but not to touch anything that was physically connected with them and which might become a conductor of electric current.''

In *Shade* v. *Bay Counties Power Co.*, 152 Cal. 10 [92 Pac. 62], an opinion written many years ago, where the injured person attempted to move a live wire, the court said:

''The deceased was not a backwoodsman who had never heard of electrical plants and the danger which lurks in live wires—if, indeed, such a person could be found in California. He had been born and had always lived in the city of Vallejo, where, as in nearly every American city, electricity is used, was a business man, twenty-eight years old, and of good intelligence. He knew the danger of live wires, but was not an expert electrician. He had not been placed by the negligence of the appellant in a position of peril from which he must by some means extricate himself, so that he might have been excused if he had not used the best judgment in trying to avoid danger. He was in no danger whatever. . . . At all events it is clear that he unnecessarily, heedlessly, and recklessly

placed himself in a most dangerous position, which resulted in his receiving the deadly shock. 'No other inference than that of negligence can be drawn from' his conduct. It was careless and negligent in the extreme sense, and is fitly characterized by the old phrase 'foolhardy'. Our opinion is that he was guilty, as a matter of law, of contributory negligence, and that therefore the nonsuit should have been granted, and the verdict was unwarranted.''

In support of his contention that the question of contributory negligence was one of fact for the jury the respondent relies particularly upon *Howell* v. *San Joaquin L. & P. Corp.*, 87 Cal. App. 44 [261 Pac. 1107], and *Fairbairn* v. *American River Elec. Co.*, 179 Cal. 157 [175 Pac. 637]. In the first of these cases a man was electrocuted while working in a field apparently because an iron pipe he was handling came in contact with a power wire. There were no eyewitnesses to the tragedy, there was nothing to show he had intentionally brought the pipe into close proximity with the wires and the court, after pointing out that the pipe could have been blown against the wire without fault on his part, held that, under the circumstances, the question of whether or not he had used due care was one of fact. In the other case parties in charge of moving a hay derrick under a power wire along a public road had taken a considerable amount of precaution by removing the rear wheels in order to lower the boom and in going ahead some distance and looking back to see whether the boom was low enough to pass under the wires. While they erred in their judgment the court held that whether or not the precaution taken was reasonable under the circumstances was a question of fact.

In many cases, for example those where the injured party was engaged in work upon a roof in close proximity to power wires and where he came into contact with them accidentally or through momentary forgetfulness of their presence, it has been held that the question of whether or not he met the standard of ordinary prudence is one of fact. Such cases are not very helpful in measuring the conduct of one who voluntarily touches a power wire or an iron or steel object which is touching a power wire. There is a marked difference between accidentally touching such a dangerous instrumentality while working near it and intentionally and unneces-

sarily placing oneself in contact therewith, or in a position where such contact is likely to occur.

In the case before us the respondent voluntarily grasped this steel cable and attempted to pull on it when he knew that the boom from which it was supended was then in actual contact with a power wire, that there had just been a contact between the cable and a live wire, and that, at best, the swivel pulley to which the cable was connected was but a couple of inches from that wire. The foreman was near and there was no occasion for him to take charge of removing the derrick from the wire, no one was in danger who needed help, his action was not required by his employment and he had been particularly warned not to do that very thing. Not only is it to be presumed that he had such a knowledge of the inherent danger in such wires as is possessed by all persons of ordinary intelligence and common experience, but his own testimony shows that he had worked where electricity was used and that he fully realized the danger that was to be expected. He testified that he knew that the ''burning'' of the cable and the grass was caused by electricity, that this could come only from the wires, and that he knew it could come only through some contact between the derrick and the wires.

Nor do we think a different situation is presented if visible ''burning'' had ceased. He knew that the cable had just been charged with electricity and that some part of the derrick was still touching the wire. If contact had been broken by a slight turning of the pulley on its swivel, it could be reestablished by another turning which respondent must have known would probably follow, and which he now admits would ''necessarily'' follow, a pull on the cable. In any view of the evidence the situation was extremely dangerous. That the respondent realized the danger is shown by his testimony that his purpose was to pull the boom farther away from the wire so that it would be safe to attach the horse to the derrick and pull it back. Ordinary prudence, under these circumstances, called for the exercise of great care to make sure that contact with the cable had in fact been broken and, if it had, to keep it from being reestablished.

After realizing the danger which was present, and after a warning which he thoroughly understood, the respondent

voluntarily left a place of safety and placed himself in danger. Even if the pulley was not touching the wire, he saw that the boom was touching it, and without taking any precaution as to other possible or probable sources of contact, or as to the turning of the pulley, he grasped the cable. In thus unnecessarily exposing himself to danger he took chances which no reasonable man should take under the conditions there existing and in the face of ample visual and verbal warning.

In our opinion it cannot be said that reasonable and impartial men might differ as to whether or not the respondent used ordinary care when he voluntarily grasped this cable under these circumstances. Every case must be decided upon its own facts, but where contributory negligence so clearly appears as it does here, a plain duty rests upon the courts, regardless of a natural reluctance to set aside the verdict of a jury.

For the reasons given the judgment is reversed.

Marks, J., and Jennings, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 12, 1937.